1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TIMOTHY WATTS,                         No.  2:13-cv-1749 TLN AC P

12              Plaintiff,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   M. RUGGIERO, et al.,

15              Defendants.

16

17        I.      Introduction

18        Plaintiff is a state prisoner, currently incarcerated at California State Prison, Los Angeles

19   County, who proceeds pro se and in forma pauperis on his original civil rights complaint filed

20   pursuant to 42 U.S.C. § 1983.  See ECF No. 1.  Plaintiff challenges the conduct of prison officials

21   during his incarceration at High Desert State Prison.  Presently pending is defendants' motion for

22   summary judgment.  This matter is referred to the undersigned United States Magistrate Judge

23   pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c).  For the reasons that follow, this

24   court recommends that defendants' motion for summary judgment be granted in part and denied

25   in part.

26        II.     Background

27        Upon screening plaintiff's complaint pursuant to 28 U.S.C. §1915A(a), this court found

28   that it states the following claims against the following five defendants, see ECF No. 9 at 3:

1

The complaint states a colorable First Amendment claim against defendants Ruggiero, Campbell and Audette . . . , on grounds that they retaliated against plaintiff [by falsely validating him as a gang associate] for the filing of complaint(s) against a correctional officer or officers.  Plaintiff also states a Fourteenth Amendment due process claim against defendants Ruggiero, Audette, Marquez and Harrison for knowingly validating plaintiff as a prison gang member or associate on the basis of fabricated or insubstantial evidence, and thus improperly subjecting him to prolonged segregated housing.  Plaintiff also states an Eighth Amendment deliberate indifference claim against Correctional Sergeant Ruggiero for allegedly taking plaintiff's orthopedic boots which had been prescribed to cushion plaintiff's knees as a result of seven failed knee surgeries.

Defendants answered the complaint.  ECF No. 20.  Discovery proceeded through December 5, 2014.  ECF No. 23.  On March 6, 2015, defendants filed the pending motion, seeking summary judgment on the merits of plaintiff's First and Fourteenth Amendment claims and based on plaintiff's failure to exhaust his administrative remedies on his Eighth Amendment claim; alternatively, defendants contend that they are entitled to qualified immunity.  ECF No. 32. Plaintiff filed an opposition, ECF No. 38, and defendants filed a reply, ECF No. 42.

III.    Legal Standards for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need

only prove that there is an absence of evidence to support the nonmoving party's case." <u>Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11.  Moreover, "[a] [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." <u>Lopez v. Smith</u>, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[1]

The opposing party must demonstrate that the fact in contention is material, <u>i.e.</u>, a fact that might affect the outcome of the suit under the governing law, see <u>Anderson v. Liberty Lobby</u>,

---

[1]  In addition, in considering a dispositive motion or opposition thereto in the case of a pro se plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's verified complaint or opposition.  See <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); <u>see also</u> <u>Aholelei v. Hawaii Dept. of Public Safety</u>, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial); <u>see</u> Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

1  Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809

2  F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a

3  reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers,

4  Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

5       In the endeavor to establish the existence of a factual dispute, the opposing party need not

6  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

7  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8  trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

9  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

10 Matsushita, 475 U .S. at 587 (citations omitted).

11      In evaluating the evidence to determine whether there is a genuine issue of fact," the court

12 draws "all reasonable inferences supported by the evidence in favor of the non-moving party."

13 Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam).

14 It is the opposing party's obligation to produce a factual predicate from which the inference may

15 be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

16 aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

17 party "must do more than simply show that there is some metaphysical doubt as to the material

18 facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

19 nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

20 omitted).

21      In applying these rules, district courts must "construe liberally motion papers and

22 pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly."

23 Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  However, "[if] a party fails to properly

24 support an assertion of fact or fails to properly address another party's assertion of fact, as

25 required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion

26 . . . ." Fed. R. Civ. P. 56(e)(2).

27 ////

28 ////

1    IV.    Facts

2         Unless otherwise noted, the following facts are undisputed by the parties or, following the

3    court's review, are deemed undisputed for purposes of the pending motion.[2]

4         • At all relevant times, plaintiff was a state prisoner incarcerated at High Desert State

5    Prison (HDSP), under the authority of California Department of Corrections (CDCR).

6         • During his incarceration at HDSP, plaintiff pursued a civil rights suit against officials at

7    California State Prison-Sacramento (CSP-SAC), including against Correctional Officer Flory.[3]

8         • The Black Guerilla Family (BGF) is a prison gang involved in violent and criminal

9    activities both inside and outside prisons, the latter in association with street gangs.  Formed in

10   1966, BGF has branches in prisons throughout the United States.  "Originally, the BGF was an

11   ideologically based, African-American Marxist revolutionary organization with the stated goal of

12   overthrowing the United States government, . . . target[ing] what it believed to be the white-racist

13   infrastructure of the prison system."  Marquez Decl. ¶ 16; Harrison Decl. ¶ 12.  George Jackson

14   was a co-founder of BGF and is revered as a martyr for the gang.  Jackson was an inmate,

15   political activist, writer, and member of the "Soledad Brothers," and was killed in a prison

16   uprising in August 1971.  BGF created the annual observance "Black August" to pay tribute to

17   George Jackson and others.  Marquez Decl. ¶ 17-22; Harrison Decl. ¶ 13-4.  BGF "uses Black

18   August literature as propaganda to spread the gang's beliefs and ideologies throughout the prison

19   system, and to train new members and associates."  Marquez Decl. ¶ 22; Harrison Decl. ¶ 14.  For

20   this reason, an inmate's possession of Black August literature is considered by CDCR to be an

21   ───────────────────

22   [2]  The court has reviewed defendants' statement of undisputed facts, ECF No. 32-2; defendants'
     response to plaintiff's disputed facts, ECF No. 42-2, and defendants' respective declarations and
     exhibits, see ECF Nos. 32-3 through 32-10.  The court has also reviewed plaintiff's verified

23   complaint and exhibits, ECF No. 1; verified opposition, response to defendants' undisputed facts,
     and exhibits, ECF No. 38; and deposition testimony, see ECF No. 34.  (Although the hand-written

24   portion of plaintiff's complaint is not verified, see ECF No. 1 at 30, the form portion is, see ECF
     No. 1 at 4, and the court liberally construes these portions together for purposes of addressing the

25   instant motion.).  Defendants' objections to plaintiff's evidence, see ECF No. 42-1, are overruled;
     the court relies on plaintiff's evidence to the extent it is relevant to the issues before the court.

26   [3]  On October 4, 2010, plaintiff initiated a civil rights action entitled Watts v. Flory et al., Case
     No. 2:10-cv-2688 GEB CKD P.  Summary judgment was entered for defendants on December 4,

27   2014.  Plaintiff's appeal was dismissed on April 22, 2015.  This court may take judicial notice of
     its own records and the records of other courts.  See United States v. Howard, 381 F.3d 873, 876

28   n.1 (9th Cir. 2004); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

indirect link to BGF and a legitimate validation point.  Marquez Decl. ¶ 22-3; Harrison Decl. ¶ 14.  BGF has adopted the silverback gorilla as a symbol of allegiance to and membership in the gang.  Marquez Decl. ¶ 29-30; Harrison Decl. ¶ 19.  Hence, CDCR considers an inmate's possession of a picture of a silverback gorilla as some evidence of the inmate's association with BGF.  Id.

- In 2011, CDCR's gang validation procedures included, at each prison, the Warden's appointment of a Correctional Lieutenant to serve as an Institutional Gang Investigator (IGI). "IGIs are specifically trained to recognize gang activity and are tasked with documenting allegations and evidence of gang involvement and gang activity within the prison system." Marquez Decl. ¶ 11; Harrison Decl. ¶ 14.  "The IGI was the critical decision maker in the gang-identification process.  The IGI was tasked with investigating allegations of gang involvement, confirming whether sufficient evidence supported the validation decision, and ensuring that the inmate received advance notice of the charges and an opportunity to present his views, including a written rebuttal.  When the IGI gathered enough information to present at least three points of validation, the evidence, known as a validation package, was provided to a SSU [Special Services Unit] Special Agent for administrative verification.  A second Special Agent then reviewed and confirmed the validation decision."  Harrison Decl. ¶ 11; Marquez Decl. ¶ 15.

- "Validation was the process through which CDCR formally identified an inmate's membership in or association with a prison gang.  Under CDCR regulations, at least three independent sources items indicative of association with the gang were required.  At least one item had to show a direct link between the inmate and a current or former validated gang member or associate."  Harrison Decl. ¶ 10.

- Defendant M. Ruggiero was at all relevant times employed by CDCR as a Correctional Sergeant and Assistant Institutional Gang Investigator (Assistant IGI) at HDSP, whose responsibilities included gathering and documenting evidence of prison gang involvement and activity.  Ruggiero Decl. ¶¶ 1-2, Dfs. Ex. 8, ECF No. 32-8 at 31-7.[4]  When evidence was brought

---

[4]  Page references reflect the court's electronic pagination as reflected on the docket pursuant to the court's Case Management/Electronic Case Files (CM/ECF) system.

1   to his attention implicating an inmate's association with a gang, defendant Ruggiero was required

2   to conduct an investigation and, if appropriate, consolidate the evidence in a validation package

3   and transmit it to the Special Services Unit (SSU) of the Office of Correctional Safety (OCS) for

4   final review.  Id. ¶ 2.

5   • Defendant Ruggiero maintains that his "investigation of Watts was triggered by another

6   correctional officer who suggested that Watts might be associated with the [BGF] gang." Id. ¶ 9.

7   The gang validation packet subsequently prepared by Ruggiero indicates that the investigation

8   into plaintiff's suspected gang affiliation was initiated on April 1, 2011.  See Dfs. Ex. C

9   (Validation Packet), ECF No. 32-7 at 3.  Ruggiero recounts that an initial search of plaintiff's cell

10   was conducted on April 21, 2011,[5] which disclosed plaintiff's possession of the name and CDCR

11   number of inmate Austin inscribed on the back of a photo of E. Austin, plaintiff and a third party.

12   Austin was a validated BGF associate who had formally dropped out of the gang.  Ruggiero avers

13   that this evidence supported plaintiff's association with the BGF, "one point supporting his

14   validation," and that he was required to document it.  Id. ¶ 10; see also id. at ¶¶ 27, 40 (possession

15   of name and number of a current or former validated gang member or associate is considered one

16   point of validation and a direct link to the gang).

17   • Defendant E. Campbell was at all relevant times employed by CDCR as a Correctional

18   Officer at HDSP, and "intermittently worked with the IGI Unit on special assignments involving

19   gang debriefings during 2011;" however, he "was not responsible for, or involved in, the decision

20   to validate" plaintiff or place him in segregated housing.  Campbell Decl. ¶¶ 1-4, Dfs. Ex. 9, ECF

21   No. 32-8 at 30-8.

22   • On April 28, 2011, defendant Campbell and Officer Nelson conducted a search of

23   plaintiff's cell incidental to a broader search.  In response to a report that an inmate had a phone,

24   and a search of his cell failed to disclose the phone, Campbell and his partner were directed to

25   search adjacent cells, including plaintiff's, and did so in plaintiff's absence.  Id. ¶¶ 7, 11, 13, 15,

26

---

27   [5]  No cell search receipt has been submitted by any party concerning the April 21, 2011 search.
     Although the receipt for defendant Ruggiero's May 9, 2011 search of plaintiff's cell, discussed
28   below, includes the confiscation of "1 photo," that photo has not been identified.

17-8.  The search was conducted at the direction of Campbell's supervisor, not defendant Ruggiero.  Id. ¶¶ 16-7.  At the time of the search, Campbell did not know plaintiff or Officer Flory.  Id. ¶¶ 8, 10.  The search included books and stacks of documents because contraband can be hidden in cavities created by cutting out pages of those items.  Id. ¶ 19.

• During the April 28, 2011 search of plaintiff's cell, Campbell discovered a 2008 California Prison Focus publication, see Dfs. Ex. B,[6] and a picture of a silverback gorilla, see Dfs. Ex. C (indicating on the cell receipt, "I/M [inmate] torn out of magazine").  Id. ¶ 20.  Because these items "were indicative of [plaintiff's] possible association with the BGF prison gang," Campbell confiscated them and provided them to defendant Assistant IGI Ruggiero for further investigation.  Id. ¶¶ 20-5.

• Plaintiff avers that the April 28, 2011 search of his cell was conducted at the direction of defendant Ruggiero, with the specific goal of locating items that would support plaintiff's validation.  Plaintiff alleges that the picture of the gorilla was torn out of his National Geographic magazine or art book by defendant Campbell.  See Compl., ECF No. 1 at 7, 11, 25, 44, Ex. C (cell search receipt); Oppo., ECF No. 38 at 3, 55, Ex. C (same); see also Oppo., ECF No. 38 at 4, 5, 18, 24 ("both art book and National Geographic"); Pl. Depo.  23:18-22 (picture was in plaintiff's "stack of pictures" in a hard cover book).

• On May 9, 2011, defendant Ruggiero searched the property confiscated from plaintiff's cell by defendant Campbell on April 28, 2011, "which included a picture of a silverback gorilla and a Prison Focus magazine containing an article on Black August," together serving as one "source document . . . [constituting] one point supporting his validation."  Id. ¶ 11; see also id. at ¶¶ 23, 31 (possession of Black August article and possession of picture of silverback gorilla each considered "a legitimate point of validation, and an indirect link to the gang").

---

[6]  The court grants defendants' request, see ECF No. 32-4, to take judicial notice of the Summer 2008 edition of California Prison Focus magazine (No. 31), entitled "Black August, We Will Never Forget."  See Dfs. Ex 2-B.  Defendants also direct the court to a website that provides an electronic copy of the edition.  See Fed. R. Evid. 201(b) (court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  See also Mack v. S. Bay Beer District, 798 F.2d 1279, 1282 (9th Cir. 1986) (authorizing courts to take judicial notice of matters of public record).

- Also on May 9, 2011, defendant Ruggiero conducted an independent search of plaintiff's cell. See Compl., ECF No. 1 at 45, Ex. C (cell search receipt); Oppo., ECF No. 38 at 3, 56, Ex. C (same). Ruggiero confiscated plaintiff's address book and what he thought were plaintiff's "privately owned, non-state-issued boots." Ruggiero Decl. ¶ 12, and Dfs. Ex. 4-D. Ruggiero avers that he "did not know that the boots were orthopedic or medically required, and I was not aware of Watts' medical needs. I did not know that the confiscation of the boots posed any substantially serious risk to Watts' health. I did not see any medical chrono authorizing Watts to have the boots. Because it appeared that the boots were contraband, I believed that I was required to confiscate them." Id.

- Upon examining plaintiff's address book, Ruggiero discovered a "mail-drop" address for inmate Chappell, under the name F. Richard. Ruggiero explains, "CDCR regulations preclude gang-affiliated inmates from corresponding with other inmates. To prevent correctional staff from knowing the destination and recipient, and therefore avoid detection, gang members and associates commonly use mail-drop addresses to communicate. An inmate sends correspondence to a street address (the mail drop) for the recipient to forward to another inmate. The fact Watts possessed an address used by a validated associate of the BGF showed that he had the ability to communicate with the gang." Id. ¶ 13.

- On May 11, 2011, defendant Ruggiero "searched the outgoing mail for the facility where Watts was housed . . . [and] discovered an envelope that Watts was attempting to send to Chappell using the mail-drop address. The envelope contained two letters. The first letter was intended for [F]. Richard and thanked her for helping Watts get in touch with inmate Chappell. The second letter was intended for inmate Chappell." Id. ¶ 14. Plaintiff's letter to Chappell thanked him for "the documents Preliminary Injunction or Temporary Restraining Order you sent to me," and a "Declaration package;" sent good wishes for the recovery of Chappell's father; and informed Chappell that plaintiff's cell had been searched, with officials confiscating, inter alia, "my prison focus Mag that's in my name. And two pictures of Silver Backs. Then told me they're turning them into IGI. . . . They have been playing with my mail for the longest. . . . They can't tell me what to draw. . . ." See Dfs. Ex. C, ECF No. 32-7 at 9.

9

- Defendant Ruggiero determined that plaintiff's "possession of Chappell's mail-drop address, and his documented use of that address to communicate with Chappell, directly linked him to the BGF, and was some evidence of his association with the gang. . . . [and] a point of validation."  Ruggiero Decl. ¶ 36.

- Because Ruggiero had three independent source items indicating plaintiff's association with BGF, including direct links to current or former validated associates, he "was required to prepare and submit a gang-validation packet."  Id. ¶ 16.

- On June 1, 2011, Ruggiero completed plaintiff's Gang Validation Packet, consisting of a CDCR 128B cover sheet and documentation of the following three "source items," see Dfs. Ex. C (Validation Packet), ECF No. 32-7 (emphasis added):

> SOURCE ITEM NO. 1 **(Association/Direct Link):**  CDCR 128-B4, dated May 13, 2011, completed by defendant Ruggiero, asserts a "direct link" between plaintiff and a current validated BGF associate.  See Cal. Code Regs. tit. 15, § 3378(c)(4) (2011) (validation of prisoner as a gang associate requires at least one source item demonstrating a direct link to a current or former validated member or associate of the gang within six months of the identified activity).  In support of this source item, Ruggiero noted that **plaintiff's address book, confiscated from his cell on May 9, 2011, included a known "mail-drop address" for another inmate, [R]. Chappell, a validated BGF associate.**  A "mail-drop" or "boomerang" address is used by one prisoner to communicate with another prisoner, via a nonprisoner at the mail-drop address who forwards mail to its intended recipient.  The drop address identified in plaintiff's address book is that of F. Richard, the girlfriend of [R]. Chappell.  Review of Chappell's validation package revealed an envelope from Chappell addressed to F. Richard, which had previously contained another envelope and letter intended to be forwarded to another prisoner.  Further, **Ruggiero noted that on May 11, 2011, he discovered in HDSP's intended outgoing mail an envelope from plaintiff addressed to F. Richard, which contained two letters, one intended for F. Richard, the other letter intended for Chappell.**
>
> SOURCE ITEM NO. 2 **(Symbols):** CCDR 128-B4, dated May 15, 2011, completed by defendant Ruggiero, identifies **two BGF symbols** in plaintiff's possession.  See Cal. Code Regs. tit. 15, § 3378(c)(8)(B) (2011) (symbols must be distinctive to the specific gang).  In support of this source item, Ruggiero noted that the **search of plaintiff's cell on May 9, 2011 disclosed the following items:  (i) a California Prison Focus magazine with the words "Black August" on the cover, containing an article entitled "Black August 2008" and a picture of BGF co-founder George Jackson,** who was killed in August 1971, while a prisoner  at San Quentin, see also Dfs. Ex. B (California Prison Focus magazine No.

10

31, Summer 2008), ECF No. 32-6 at 5-37); **and (ii) a photograph of a Silverback Gorilla, which "appeared to be cut out of a magazine and was hidden inside of an envelope in order to be concealed."**   Ruggiero noted that "[t]he month of August is commonly referred to as Black August among [BGF] members/ associates . . . to honor [brothers] George and Jonathan Jackson . . . [and] use[] this month to train, recruit new members, and focus on fighting CDCR. . . ."  Ruggiero also noted that the "Silverback Guerilla" represents the BGF gang name, and is intended to reflect the dominant and controlling characteristics of its members. Ruggiero concluded that plaintiff's possession of these symbols demonstrate his "loyalty and allegiance" to BGF.

SOURCE ITEM NO. 3 (**Association/Direct Link):** CDCR 128-B4, dated May 17, 2011, completed by defendant Ruggiero, asserts another "direct link" between plaintiff and a current BGF associate, [E]. Austin.  **Including in a stack of photographs in plaintiff's cell when it was searched on April 21, 2011, was a photograph which, on the back, contained the handwritten name and CDCR number of Austin, a validated BGF associate.**  Ruggiero concluded that this information "shows that [plaintiff] has the ability to communicate with a validated associate" of BGF, thus establishing another gang association and direct link.   See Cal. Code Regs. tit. 15, § 3378(c)(8)(G) (2011) (association).

• The cover sheet of the validation packet indicates that the evidence underlying plaintiff's proposed validation was disclosed to plaintiff on June 1, 2011.  See Dfs. Ex. C (Validation Packet), ECF No. 32-7 at 3.  However, the Gang Validation Chrono completed June 21, 2011 indicates that the disclosures were made on May 31, 2011.  Id., ECF No. 32-7 at 4.

• Plaintiff avers that, on June 1, 2011, five HDSP officers escorted him from his cell to the Program Office to talk with defendant Ruggiero and Officer Wheeler.  Defendant Ruggiero told plaintiff that he was recommending his validation, and informed him of the underlying evidence.  Defendant Ruggiero allegedly told plaintiff that he knew plaintiff was not a BGF member but "we're gonna validate you anyway, just because you know [] Chappell and you filed a civil suit on Officer Flory [who] is a good officer [and a personal friend of mine while I was at Folsom].  We validated Chappell the same way.  We knew he wasn't BGF either."  Compl., ECF No. 1 at 9, 12; see also Oppo., ECF No. 38 at 2.  Allegedly, Ruggiero further stated, "We know both you guys come from East Palo Alto California.  We know both of you don't belong to any gang.  But you're not programmers.  All you and Chappell do is file law suits. . . . I know you and Chappell from Folsom. . . . That's why I'm validating you, you file nothing but paper work on

11

1  officers."  Compl., ECF No. 1 at 10.

2      • Defendant Ruggiero also allegedly told plaintiff, "'I'm gonna take your personal boots,

3  I happen to like those Stacy Adams, and then I'm gonna break your TV," and he did exactly that."

4  Compl., ECF No. 1 at 13.

5      • Plaintiff avers that defendant Ruggiero also stated that he was aware plaintiff had lost

6  his parents and son while serving his life sentence, and defendant intended to validate plaintiff to

7  "just compound all that," leading plaintiff to request placement on suicide watch.  Id. at 10-1.

8  Plaintiff was placed in the Administrative Segregation Unit (ASU) on June 1, 2011.  On June 9,

9  2011, plaintiff appeared before the Institutional Classification Committee (ICI), which decided to

10  retain plaintiff in the ASU pending the conclusion of the validation process.  See Pl. Ex. B

11  (Classification Chrono), ECF No. 1 at 42.

12      • Defendant Ruggiero denies that he told plaintiff he knew plaintiff was not associated

13  with BGF, or that he would make plaintiff's validation "stick."  Id. ¶¶ 20, 21.  Ruggiero also

14  denies that he had any "authority over, or involvement in, any housing or placement decision for

15  inmate Watts."  Id. ¶ 23.

16      • Defendant Ruggiero avers that he "knew Officer Flory because he had worked with

17  him two or three times" at CSP-SAC, and considers Flory a coworker, but not a friend.  Ruggiero

18  avers that "[a]ny complaints, accusations or litigation that Watts pursued against Officer Flory

19  had no bearing on my actions in investigating and documenting Watts' association with BGF."

20  Id. ¶ 22.

21      • In response to receiving the evidence in his gang validation packet, plaintiff submitted

22  a written rebuttal, which he signed on June 17, 2011.  See Dfs. Ex. C (Validation Packet), ECF

23  No. 32-7 at 3.  On June 21, 2011, plaintiff was interviewed by defendant Ruggiero and provided

24  an opportunity to rebut the evidence in the packet.  Id. at 4.  On the same date, defendants

25  Ruggiero and Audette signed and authorized plaintiff's Gang Validation Chrono, and indicated

26  that the information would be forwarded to the OCS.  Id.; see also Ruggiero Decl. ¶ 17.

27      • Ruggiero avers that he had no authority over plaintiff's validation after the packet was

28  transferred to OCS, explaining that "I was not the final decision maker regarding Watts'

1  validation and I had no authority over the OCS's review, or whether the OCS would validate

2  Watts." Ruggiero Decl.    ¶ 21.

3      • Defendant A. Audette was at all relevant times employed by CDCR as the Acting

4  Lieutenant, and then Lieutenant, of HDSP's IGI Unit.  He states that "[i]t is the responsibility of

5  the [IGI] Unit to investigate and document evidence" indicative of gang association.  Defendant

6  Audette "did not personally conduct gang-validation investigations or instruct my officers whom

7  to investigate," but his "role in the validation process was limited to reviewing the validation

8  packets prepared by other officers," who were the "critical decision makers" in the validation

9  process.  Audette Decl. ¶¶ 1-5, Dfs. Ex. 7, ECF No. 32-8 at 22-9.

10      • Defendant Audette's role is limited to assessing whether there is "sufficient evidence

11  [in a gang validation packet] . . . to comply with CDCR regulations."  Id. ¶ 5.  If so, defendant

12  Audette forwards the packet to the OCS for review, at which point he "ha[s] no authority over the

13  packet or the inmate's validation."  Id.  In the instant case, defendant Audette avers that he "did

14  not personally investigate Watts' association with the BGF, direct the search of Watts' cell, or

15  direct that Watts' association with the BGF be investigated.  Assistant IGI Ruggiero was

16  responsible for investigating the evidence of Watts' gang involvement, determining whether

17  sufficient evidence existed to submit a validation packet to the OCS, and ensuring that Watts had

18  notice of the charges and an opportunity to present his views."  Id. ¶ 11.  Defendant Audette

19  continues, "[a]s Ruggiero's supervisor, I reviewed the validation packet that he prepared

20  documenting Watts' association with the BGF before it was submitted to the OCS for review, and

21  confirmed that the documentation satisfied CDCR's requirements to substantiate validation[].

22  Because it did, it was my duty to forward the packet to OCS for review."  Id. ¶ 12.

23      • Defendant Audette avers that "[m]y signing of Watts' validation packet was based only

24  on my review of the evidence Ruggiero provided. . . . I had no reason to believe that the packet

25  [may have] been submitted for any improper reason.   I did not know of any litigation that inmate

26  Watts may have been pursuing, . . . I did not know whether Watts participated in CDCR

27  programming opportunities . . . I never worked at Folsom State Prison, and I do not know an

28  officer Flory."  Id. ¶ 18.

1   • Defendant Audette submitted plaintiff's validation packet to OCS on approximately

2   June 27, 2011.  Id. ¶ 20.

3   • Defendants R. Marquez and J. Harrison were at all relevant times Special Agents in the

4   SSU, a division of the OCS, which is an investigative arm of CDCR.  The SSU is charged with

5   investigating and thwarting prison gang activities, and trains IGIs.  Marquez Decl. ¶¶ 1-3;

6   Harrison Decl. ¶¶ 1-3.  Both agents were responsible for conducting "an independent,

7   administrative, third-party review of gang validation packets to verify that at least three of the

8   points of validation met CDCR's regulatory criteria."  Marquez Decl. ¶ 5; Harrison Decl. ¶ 5.

9   • "On June 27, 2011, the SSU received a validation package from High Desert State

10  Prison [] for inmate Timothy Watts [].  The package contained three forms documenting Watts'

11  association with the BGF."  Marquez Decl. ¶ 33; Harrison Decl. ¶ 20.  Agents Marquez and

12  Harrison both reviewed plaintiff's validation package "to verify that at least three points of

13  validation met CDCR's regulatory criteria, and confirmed that they did."  Id.

14  • On September 7, 2011, Agents Marquez and Harrison both approved and signed

15  plaintiff's formal validation, and issued a CDC 128-B2 Chrono documenting that approval.  See

16  Marquez Decl. ¶ 41; Harrison Decl. ¶ 24; see also Dfs. Ex. 3(C), ECF No. 32-7 at 5.  Consistent

17  with CDCR regulations, neither agent met or otherwise communicated with plaintiff before

18  affirming his validation, because it is the responsibility of the assigned IGI to provide the inmate

19  with the evidence in his packet and an opportunity to be heard.  Marquez Decl. ¶ 42; Harrison

20  Decl. ¶ 25.

21  • Agents Marquez and Harrison "had no authority over, and [were] not involved in, any

22  housing or placement decision for inmate Watts."  Marquez Decl. ¶ 8; Harrison Decl. ¶ 8.

23  • Plaintiff received a copy of the final Validation Chrono, dated September 7, 2011, on

24  October 12, 2011.  See Dfs. Ex. C, ECF No. 32-7 at 5; Audette Decl. ¶ 20.

25  • On October 16, 2011, plaintiff signed and submitted an administrative appeal

26  challenging his validation on due process grounds.  See Appeal Log No. HDSP-11-01661,

27  Compl., ECF No. 1 at 3, 108-16 (Ex. L); see also Oppo., ECF No. 38 at 81-90 (Ex H).  The

28  appeal alleged the failure of staff to provide plaintiff with a Form 1030 before placing him in Ad

14

Seg, and false statements by staff that plaintiff was informed of the evidence underlying his

validation on May 31, 2011, rather than June 1, 2011.  The appeal challenges the reliance on a 15-

year-old photo to validate plaintiff despite regulations limiting such reliance to photos taken no

more than six years before.[7]  Plaintiff requested that "I be released from Ad-Seg [due] to my due

process rights have been violated.  Per (DOM, under reliability)."

- First level review was bypassed on October 18, 2011.  See ECF No. 1 at 111, 113.  A

second level review decision, denying plaintiff's appeal, was issued by HDSP's Chief Deputy

Warden on January 10, 2012, reportedly following plaintiff's interview with defendant Audette

on the same date.  The second level decision provided in pertinent part, see ECF No. 1 at 115-16:

> [1] "Due to the fact that there was not confidential information used, IGI [Institutional Gang Investigation] was not required to issue you a CDCR 1030 form documenting any confidential information."
>
> [2] "IGI used the name and CDCR number of Inmate Austin as a direct link in your validation and not the photograph itself. . . . [Although] [t]here is a six-month (sic) rule when using photographs in a validation . . . this rule does not apply when using an inmate's name and CDCR number."
>
> [3] "HDSP IGI submitted your validation package to the Office of Correctional Safety (OCS) for review and processing . . . [which]

---

[7]  As initially framed in his appeal, plaintiff alleged as follows, see ECF No. 1 at 111, 113 (sic):
> I just received my CDC 128-B per validation I am appealing June 9, 2011.  Staff claim there was three anonymous notes dropped on me from the lower year 2-Block by one inmate indicating that I was a associate of BGF which lead to staff removing me out of (D-Fac GP) and placing me in (Ad-Seg).  Staff failed to provide me with a 1030-Form which is required before placing a inmate in Ad-Seg note:  Check the (DOM, under reliability) and (see 114-D dated June 1, 2011.  Disclosure part is not dated.  That is a violation of my due process rights.)  On the gang validation chrono dated: 6-21-11 disclosure and notification states:  On May 31, 2011 at approximately 11:45 hrs subject was disclosed all into being utilized in the validation process.  Quote: Subject was disclosed all info via CDCR-128-B as relevant to his validation.  I didn't have knowledge of any validation was taken place until June 1, 2011, when 4 staff members came to my cell to escort me to program.  CDCR-128 B dated 5-17-11 (Association/Direct Link).  The photo is (15) years old.  3378 Documentation of Critical Case Info. (d) Photographs.  Individual or group photographs with gang connotations such as those which include insignia symbols, or validated gang affiliated.  No photograph shall be considered for validation purposes that is estimated to be older than six (6) years.

> concurred with the HDSP IGI Unit's conclusion . . . [and] followed
> all rules and regulations. . . ."

• Plaintiff appealed the second level review decision on January 24, 2012, asserting in pertinent part:  (1) A Form 1030 was warranted because Officer Wells informed plaintiff in Ad Seg that IGI searched plaintiff's cell based on confidential information obtained from three "kites" prepared by other inmates; (2) plaintiff was never interviewed by defendant Audette or any other official concerning his appeal; and (3) the notations on the back of the confiscated photograph are not indicative of gang activity because placed there to "ensure that [the photo] would not get lost[.]"  See ECF No. 1 at 112, 114.

• The third and final level decision was issued on July 19, 2012, denying plaintiff's appeal on the same grounds set forth in the second level decision.  See ECF No. 1 at 108-09.  This appeal, Log No. HDSP-11-01661, is plaintiff's only relevant appeal that was administratively exhausted.

• Nevertheless, plaintiff asserts that he attempted to pursue a second appeal.  Attached to plaintiff's complaint is a putative appeal with supporting exhibits challenging Audette's alleged conduct, signed by plaintiff on January 12, 2012 and designated "my copy."  See Compl., ECF No. 1 at 122-28, Pl. Ex. M.  There is no indication that these documents were officially received or responded to, and no other evidence of record so indicates.  The putative appeal alleges that defendant Audette, on January 5, 2012, attempted to bribe plaintiff, offering to "dismiss" his validation and supply plaintiff with drugs he allegedly confiscated from other inmates, in exchange for becoming an informant.  Attached is a putative letter from plaintiff to HDSP Warden McDonald, dated January 5, 2012, which states that it is plaintiff's second letter to McDonald concerning these matters.  Plaintiff avers therein that, on January 1, 2012, Audette came to plaintiff's cell "for a 602 hearing" and, ECF No. 1 at 128 (sic):

> [D]uring that time he [Audette] told me that they really don't have
> anything on you for, but we will validate you because that's what
> Ruggiero wants.  But this validation shit will go away if you drop
> the civil suit on C/O Flory, and go back out of here and be an
> informant for us.  He then said it doesn't have to be all us, it comes
> with its advantages.  Like if we bust somebody with drugs you get
> part of that.  But if you refuse (You will get validated).

- Further confusion concerning these dates is contained in the body of the complaint. Plaintiff avers that defendant Audette "came to interview plaintiff on his CDC-602 (for gang validation at plaintiff's cell door) and was screaming out plaintiff's business. That was January 10, 2012." Compl., ECF No. 1 at 19. Plaintiff alleges that Audette conceded that "we really don't have anything on you . . . but even Ruggiero will back off if you drop the civil suit against Officer Flory . . . and go back out here and be an informant for us. . . . [I]t comes with its advantages 'like we bust somebody with drugs you get part of that. But if you refuse you will be validated.'" Id. at 19, 21, 25-6, and Pl. Ex. M; Oppo., ECF No. 38 at 8, 11-2, 16, 20, 22; see also Pl. Depo. 27:18-21; 28:20-29:21. However, at his deposition, plaintiff testified that defendant Audette never spoke with him about his gang validation appeal on January 10, 2012. Rather, plaintiff testified that it was January 25, 2012 when Audette came to plaintiff's cell door to interview plaintiff about another appeal (concerning the misplacement of plaintiff's cane) and allegedly attempted to bribe plaintiff. Pl. Depo. 29:1-17.

- Defendant Audette disputes plaintiff's allegations that he told plaintiff he would push his validation unless plaintiff dropped his civil suit against Officer Flory and serve as an informant. Moreover, Audette emphasizes that in January 2012, the date of his alleged conduct, plaintiff had already been validated for four months. Audette Decl. ¶ 21.

- On August 19, 2013, plaintiff filed the complaint in this action.[8] See ECF No. Plaintiff pursues a Fourteenth Amendment due process claim against defendants Ruggiero, Audette, Marquez and Harrison, for allegedly relying on unreliable evidence to validate plaintiff as a BGF associate and their alleged failure to adhere to required procedures to validate plaintiff and place him in segregated housing. Plaintiff also pursues a First Amendment claim against defendants Ruggiero, Audette and Campbell, on the alleged ground that they validated plaintiff in retaliation for his then pending civil rights action against CSP-SAC Correctional Officer Flory. Finally, plaintiff asserts an Eighth Amendment claim against defendant Ruggiero on the ground that he

---

[8] This filing date is based on the prison mailbox rule, pursuant to which a document is deemed served or filed on the date a prisoner signs the document and gives it to prison officials for mailing. See Houston v. Lack, 487 U.S. 266 (1988) (establishing prison mailbox rule); Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010) (applying the mailbox rule to both state and federal filings by incarcerated inmates).

allegedly acted with deliberate indifference to plaintiff's serious medical needs when he confiscated plaintiff's orthopedic boots.

- Plaintiff alleges that, as a result of his validation and related placement in the Segregated Housing Unit (SHU), he has suffered mentally and physically. Plaintiff seeks expungement of his validation and release from the SHU based on "an adequate professional review of [his] 30 years of accumulated central file" and "a polygraph examination administered by [a] court appointee (independent of CDCR)." Compl., ECF No. 1 at 29. Plaintiff seeks an order directing CDCR officials to stop attempting to cell plaintiff with BGF members, and directing the return of plaintiff's address book so that he can communicate with family. Plaintiff also seeks compensatory and punitive damages. More broadly, plaintiff seeks elimination of CDCR's reliance on inmate subscriptions to California Prison Focus magazine as a validation source item, and elimination of CDCR's requirement that an inmate debrief or become an informant as a precondition for formally disassociating from a gang. Compl., ECF No. 1 at 28-30.

- Defendants move for summary judgment on the merits of plaintiff's First and Fourteenth Amendment claims, and on the ground that plaintiff failed to administratively exhaust his Eighth Amendment claim. The court resolves each of these matters on the merits, and therefore does not reach defendants' alternative contention they are entitled to qualified immunity.

V.      Fourteenth Amendment Due Process Claims

Plaintiff challenges the reliability of each of the source items underlying his validation, the procedures by which he was validated and moved to segregated housing, and the handling of his administrative appeal.

A.      Reliability of Source Items

Plaintiff contends that defendants Ruggiero, Audette, Marquez and Harrison violated plaintiff's Fourteenth Amendment due process rights by validating him as a BGF associate based on "coerced, erroneous, false [and] unreliable information." Compl., ECF No. 1 at 8. Plaintiff maintains that he is not BGF and doesn't want to associate with BGF associates and members.

1    The court focuses on the arguments set forth in plaintiff's rebuttal to his proposed validation.  See

2    Dfs. Ex. C (Validation Packet), ECF No. 32-7 at 12-3.

3                              1.    Legal Standards

4          In 2011, when plaintiff was validated as a BGF associate, California regulations defined

5    an "associate" of a prison gang as an inmate "who is involved periodically or regularly with

6    members or associates of a gang."  Cal. Code Regs. tit. 15, §§ 3378(c)(4) (2011).  Validation as a

7    prison gang associate required evidence of "at least three (3) independent source items of

8    documentation indicative of actual membership," with "at least one (1) source item be[ing] a

9    direct link to a current or former validated member or associate of the gang, or to an

10   inmate/parolee or any person who is validated by the department within six (6) months of the

11   established or estimated date of activity identified in the evidence considered."  Id.  The

12   regulations listed thirteen types of "independent source items."  Id., § 3378(c)(8).  "If a source

13   item does not categorically evidence gang affiliation or activity, prison officials may only rely on

14   it if they can articulate how that item provides such evidence."  Castro v. Terhune, 712 F.3d 1304,

15   1311 (9th Cir. 2013) (citing 15 Cal. Code Regs. § 3378(c)(8) (2013)).

16         The standards are less stringent when a federal district court assesses the reliability of the

17   evidence underlying a California prison's validation decision.  A validation decision meets

18   federal due process requirements if it is supported by "some evidence."  Bruce v. Ylst, 351 F.3d

19   1283, 1287 (citing Superintendent v. Hill, 472 U.S. 445, 454 (1985)).  A single piece of evidence

20   may satisfy this "some evidence" requirement if the evidence has a "sufficient indicia of

21   reliability."  Bruce, 351 F.3d at 1288 (citing Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir.

22   1990), cert. denied, 502 U.S. 874 (1991)).  As summarized by the Ninth Circuit, Castro v.

23   Terhune, 712 F.3d at 1314:

24              "Some evidence" review requires us to ask only "whether there is
               any evidence in the record that could support the conclusion."
25              Bruce, 351 F.3d at 1287 (emphasis added).  This test is "minimally
               stringent."   Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994).
26              Accordingly, "we do not examine the entire record, independently
               assess witness credibility, or reweigh the evidence."  Bruce, 351
27              F.3d at 1287.  Evidence only must bear "some indicia of reliability"
               to be considered "some evidence."  Toussaint v. McCarthy, 926
28              F.2d [at] 803 [].  Moreover, evidence may qualify as "some

                                             19

1       evidence," even if it does not "logically preclude[ ] any conclusion
2       but the one reached."  Hill, 472 U.S. at 457.

3       Significantly, plaintiff does not contest the authenticity of the contested evidence in the

4   instant case.  Plaintiff concedes that he had possession of each piece of evidence before it was

5   confiscated.  It is the reliability of prison officials' interpretation of the evidence that plaintiff

6   challenges.  Cf. Cal. Code Regs. tit. 15, § 3321 (assessing reliability of confidential information);

7   Toussaint, supra, 926 F.2d at 805-06 (assessing reliability of scientific evidence, i.e. polygraph

8   exams).

9                   2.      Reliability of Evidence Underlying Each Source Item

10                          a.      Source Item One

11      The evidence underlying this source item is the mail-drop address for R. Chappell found

12  in plaintiff's address book, and plaintiff's attempted use of the address to correspond with

13  Chappell, as discovered by defendant Ruggiero when he searched HDSP's outgoing mail.  This

14  evidence was designated a "direct link" with a current validated BGF associate, and meets the

15  six-month requirement of Cal. Code Regs. tit. 15, § 3378(c)(4) (2011).

16      Plaintiff does not dispute that this address book is his, was found in his cell, and contains

17  the address of F. Richard; nor does plaintiff refute that he attempted to use the address to forward

18  a letter to Chappell, or that he wrote the subject letter.  Instead, plaintiff asserts that Chappell is

19  not really a BGF associate but, like plaintiff, was validated in retaliation for his First Amendment

20  activities.  Plaintiff explains that he was childhood friends with Chappell in East Palo Alto, their

21  families remain close and the two remain friends; that Chappell was plaintiff's cellmate for 9 out

22  of his 32 years in prison; and that plaintiff regularly communicates with Chappell to obtain help

23  with his legal work.

24      Although plaintiff's explanations for maintaining communication with Chappell are both

25  compelling and pragmatic, it is not the role of this court to assess plaintiff's credibility or reweigh

26  the evidence.  As a matter of CDCR policy, an inmate's use of a mail-drop address to

27  communicate with a validated gang associate constitutes "some evidence" that the inmate has a

28  direct link with the gang.  The Ninth Circuit has affirmed decisions of this court so finding.  See,

                                              20

1   e.g., Castro v. Prouty, 2011 WL 529493, at *2, 4, 2011 U.S. Dist. LEXIS 16694, at *4, 9-10 (E.D.

2   Cal. Feb. 3, 2011) (Case No. 1:09-cv-01763 GBC PC), aff'd, 478 Fed. Appx. 449 (9th Cir. 2012).

3   Moreover, in the instant case, plaintiff's intended letter to Chappell recounts the search of his cell,

4   the seizure of his Prison Focus magazine and "two pictures of Silver Backs," as well as the

5   pending IGI investigation.  See Dfs. Ex. C, ECF No. 32-7 at 9.  Far less explicit communications

6   have been deemed sufficient to constitute some evidence of gang affiliation.  See, e.g., Castro v.

7   Terhune, 712 F.3d at 1315 (inmate's signing of birthday card intended for a validated gang

8   member was considered "some evidence" of gang affiliation).

9        For these reasons, the court finds that plaintiff's possession and use of a mail-drop address

10   to communicate with validated BGF associate Chappell constitutes "some evidence" supporting

11   a "direct link" with a current validated BGF associate within the preceding six months.  See Cal.

12   Code Regs. tit. 15, § 3378(c)(4) (2011).  Although this finding is sufficient to sustain plaintiff's

13   validation as a BGF associate, see Bruce, 351 F.3d at 1288 (a single piece of evidence satisfies

14   the due process requirement of "some evidence" if it bears a "sufficient indicia of reliability"), the

15   court addresses plaintiff's further challenges.

16                              b.      Source Item Two

17        The evidence underlying this source item is the 2008 "Black August" edition of California

18   Prison Focus magazine, and a photograph of a silverback gorilla.  This evidence was relied on to

19   find that plaintiff possessed and retained "symbols" associated with BGF.  See Cal. Code Regs.

20   tit. 15, § 3378(c)(8)(B) (2011).

21        Plaintiff does not dispute that these items were found in his cell.  However, plaintiff

22   contends that he is an artist, has been drawing his entire life, and routinely sends his art work

23   home to family members.  Plaintiff states that he retains pictures of many types of things,

24   including animals, in magazines and art books.  He alleges that the photo of the gorilla "was not

25   hidden" but was with his "other art photos," and that it "was removed by staff from a hardcover

26   art book which I was issued [with] my personal property when I arrived."  Rebuttal, ECF No. 32-

27   7 at 12.  Plaintiff also contends that he was never informed he could not retain copies of Prison

28   Focus magazine; that he had a subscription when incarcerated at New Folsom (CSP-SAC); and

1    that, like his art materials, these copies were inspected and returned to plaintiff with his other

2    property when he transferred to HDSP.  He contends that the magazine is not on CDCR's list of

3    disapproved publications,[9] and that plaintiff has no control over what is printed in the magazine.[10]

4         As an artist whose drawings include animals, plaintiff's possession of a photograph of a

5    silverback gorilla appears nonconsequential in itself.  However, it appears that plaintiff

6    understood the significance of the photograph because he informed Chappell that correctional

7    staff had confiscated from his cell "two pictures of Silver Backs."  See Dfs. Ex. C, ECF No. 32-7

8    at 9.  Plaintiff does not dispute that Silver Back Gorillas are emblematic for BGF.  Moreover,

9    despite conflicting statements in his briefing, plaintiff did not assert in his validation rebuttal that

10   staff "tore" the picture from one of his magazines or books, only that the picture was with his

11   "other art photos" and  "removed by staff from a hardcover art book."  Rebuttal, ECF No. 32-7 at

12   12.

13        Perhaps in recognition of the picture's limited evidentiary value, Ruggiero consolidated it

14   with plaintiff's possession of the 2008 "Black August" edition of California Prison Focus

15   magazine to form one source item designated "BGF Symbols."  Plaintiff contends that he was

16   never informed of the potential consequences for possessing the Black August edition, and that its

17   confiscation from his cell was unfairly selective because plaintiff also possessed other copies of

18   Prison Focus magazine.  However, material associated with Black August and George Jackson is

19   routinely construed by CDCR to reflect alliance with BGF.  See e.g. Gray v. Woodford, 2010 WL

20   2231805, at *4, 2010 U.S. Dist. LEXIS 54662, at *27 (S.D. Cal. Feb. 10, 2010) (Case No. 05-cv-

21   1475 MMA CAB) ("some evidence" supporting validation decision included the inmate's

22

23   [9]  See Compl., ECF No. 1 at 95-100 (Ex. J), and Oppo., ECF No. 38 at 4, 57-62 (Ex. D) (Sept. 21,
     2011 CDCR Centralized List of Disapproved Publications).  This list does not include Prison
24   Focus magazine, but expressly provides that unlisted publications remain subject to disapproval
     by institutions on a case-by-case basis.
25   [10] Plaintiff relies on an August 2010 letter written to CDCR by Prison Focus staff, which states
     that the organization, now more than 25 years old, has no links with prison gangs and does not
26   promote such activity, but is a "human rights organization that . . . monitor[s] and educate[s] the
     public about the treatment and living conditions of prisoners in California's Secure Housing Units
27   (SHUs)."  See Compl., ECF No. 1 at 52-3 (Ex. D-1), and Oppo., ECF No. 38 at 64-5 (Ex. E)
     (Aug. 17, 2010 letter from Calif. Prison Focus Staff to former CDCR Secretary Cate).

28

possession of literature by George Jackson and display of a photograph of George Jackson),

report and recommendation adopted, 2010 WL 2231808, 2010 U.S. Dist. LEXIS 53694 (S.D. Cal.

June 2, 2010); see also In re Furnace, 185 Cal. App. 4th 649, 661-62 (2010) (inmate's possession

of flyer for 2005 Black August event, newspaper article promoting Black August, and book,

pictures and CD about George Jackson, in combination with direct link to BGF member,

constituted "some evidence" supporting inmate's validation) (rehearing denied June 11, 2010,

review denied Sept. 22, 2010).  Moreover, such material, which is readily distinguishable from

other prison news, may be confiscated without warning by prison officials to prevent gang

activity, even if not included on a list of disapproved publications.  See e.g. Hawkins v. Russell,

2012 WL 1027762, 2012 U.S. Dist. LEXIS 41158 (E.D. Cal. Mar. 26, 2012) (Case No. 2:08-cv-

2791 CKD P) (confiscation of book authored by George Jackson did not violate inmate's rights

under the First Amendment, or Due Process and Equal Protection Clauses).

As defendant Ruggiero averred, "I found it relevant that Watts had saved this particular

volume of the magazine, which had been published in 2008, until it was confiscated from him in

2011.  Given the restrictions placed on the volume of property inmates are permitted to retain in

their cells, Watts' decision to keep this particular publication suggested that he kept it because of

its importance to the gang."  Ruggiero Decl. ¶ 38.  This inference is reasonable and supports a

finding that plaintiff's retention and possession of the 2008 "Black August" edition of California

Prison Focus magazine, with or without the gorilla photo, was symbolic evidence of plaintiff's

affiliation with BGF and thus "some evidence" in support of his validation.

c.     Source Item Three

The evidence underlying this source item is plaintiff's possession of the name and CDCR

number of inmate E. Austin on the back of a photograph of plaintiff, Austin and a third party.

This inscription was designated evidence of association and therefore a direct link with a former

validated BGF associate.

Plaintiff does not dispute that the photo was found in his cell, and explains that it was

taken in 1995 at New Folsom.  Plaintiff explains that he and Austin both grew up in East Palo

Alto, and Austin "went to school with my younger sister and lived right around the corner from

1    my mom['s] house." Rebuttal, ECF No. 32-7 at 12.  Plaintiff explains that "[t]he reason his name

2    and number [are] on the back of the photo is because his wife paid for making our copies.  She

3    wrote his name & number on all three photos when she forwarded them to her husband." Id.

4    Plaintiff adds that he and Austin "have not once communicated with one another by mail."  Id.

5           Although plaintiff is correct that, in 2011, prison officials were precluded from relying on

6    photographs older than six years for validation purposes, see Cal. Code Regs. tit. 15, §

7    3378(c)(8)(D) (2011) ("No photograph shall be considered for validation purposes that is

8    estimated to be older than six (6) years."), only the inscription on the back of this photo was

9    relied on for purposes of plaintiff's validation.  Additionally, as asserted by defendants, California

10   district courts recognize that prison officials' reliance on an inmate's possession of a "document

11   with the name and CDCR number of an individual previously validated as a member of the BGF

12   is sufficient under the 'some evidence' standard." Barnett v. Cate, 2011 WL 5508943, at *5,

13   2011 U.S. Dist. LEXIS 129960, at *14-5 (E.D. Cal. Nov. 9, 2011) (Case No. 1:10-cv-00842 JLT

14   PC) (screening out plaintiff's validation claim as "not plausible" because he possessed George

15   Jackson's name and CDCR number, and bore tattoos of BGF symbols).

16          Although this evidence does not meet the six-month requirement of a "direct link," as

17   required in 2011, see Cal. Code Regs. tit. 15, § 3378(c)(4) (2011), it does meet the criteria for

18   association with a current or former validated gang associate, see id., § 3378(c)(8)(G).

19   Accordingly, this source item also provides "some evidence" in support of plaintiff's gang

20   validation.

21                          3.    Summary

22          Although some of the evidence underlying plaintiff's validation may reasonably be

23   construed to reflect plaintiff's long-term personal relationships with Chappell and Austin, rather

24   than gang activity, this inference is not relevant to this court's "some evidence" review.  See Hill,

25   supra, 472 U.S. at 457.  As emphasized by the Ninth Circuit, this court is not to undertake a de

26   novo review of the evidence or assess plaintiff's credibility.  See Bruce, 351 F.3d at 1287.

27   Instead, applying the "minimally stringent" test that is mandatory in this context, this court finds

28   that the record evidence supports the assessments of defendant Ruggiero and the other defendants

                                        24

1    that each source item reflects some aspect of plaintiff's gang association or activity, and thus is

2    sufficient to find the requisite "some evidence" supporting plaintiff's gang validation.  Id.

3          For these reasons, defendants' motion for summary judgment on plaintiff's due process

4    claims against defendants Ruggiero, Audette, Marquez and Harris, premised on the sufficiency of

5    the evidence underlying plaintiff's validation, should be granted.

6                    B.    Procedural Due Process Challenges

7          Plaintiff's filings may liberally be construed to present several procedural challenges.  The

8    court addresses these challenges ad seriatim.

9                          1.    Legal Standards

10         "California's policy of assigning suspected gang affiliates to the Security Housing Unit is

11   not a disciplinary measure, but an administrative strategy designed to preserve order in the prison

12   and protect the safety of all inmates."  Munoz v. Rowland, 104 F.3d 1096, 1098 (9th Cir.1997)

13   (quoted with approval in Bruce v. Ylst, 351 F.3d at 1287).  "[W]hen prison officials initially

14   determine whether a prisoner is to be segregated for administrative reasons due process only

15   requires the following procedures:  Prison officials must hold an informal nonadversary hearing

16   within a reasonable time after the prisoner is segregated.  The prison officials must inform the

17   prisoner of the charges against the prisoner or their reasons for considering segregation.  Prison

18   officials must allow the prisoner to present his views."  Toussaint v. McCarthy, 801 F.2d 1080,

19   1100, fn. omitted (9th Cir.1986), cert. denied, 481 U.S. 1069 (1987).  The "due process clause

20   does not require detailed written notice of charges, representation by counsel or counsel-

21   substitute, an opportunity to present witnesses, or a written decision describing the reasons for

22   placing the prisoner in administrative segregation."  Id. at 1100-01.  However, the determination

23   to administratively segregate an inmate must be supported by "some evidence" under the standard

24   set forth in Superintendent v. Hill, supra, 472 U.S. at 455.  Bruce, 351 F.3d at 1287.[11]

25   ////

---

26   [11]  Due process also requires that prison officials engage in periodic reviews of a prisoner's
segregated confinement.  See Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983), abrogated in part

27   on other grounds by Sandin v. Connor, 515 U.S. 472, 479-84 (1995); Toussaint, 801 F.2d at 1101.
These periodic reviews must be more than "meaningless gestures" to satisfy due process.  See

28   Toussaint v. Rowland, 711 F. Supp. 536, 540 n.11 (N.D. Cal. 1989).

2.      Procedural Challenges to Validation & Segregated Housing

At the heart of plaintiff's procedural due process challenges is his contention that the evidence does not support the decision to validate him, and therefore does not support the decision to move him to segregated housing.  However, for the reasons set forth above, the decision to validate plaintiff as a BGF associate is supported by "some evidence" under the standard set forth in Hill, supra, 472 U.S. at 455, and therefore meets due process standards.  See Castro v. Terhune, 712 F.3d at 1314, and cases cited therein.

Plaintiff also makes several procedural challenges to his validation.  First, plaintiff contends that the General Validation Chrono, dated June 21, 2011, indicates that plaintiff was provided the evidence underlying his validation on May 31, 2011; however, the evidence was not disclosed to plaintiff until June 1, 2011, as indicated on the "Evidence Disclosure and Interview Notification" form dated June 1, 2011.  Cf., Dfs. Ex. C, ECF No. 32-7 at 3 and 4.  Plaintiff appears to be correct.  Nevertheless, plaintiff was provided all of the information on June 1, 2011, and had time to prepare and submit a written rebuttal signed June 17, 2011, and to present his oral rebuttal at his interview on June 21, 2011.  Therefore, despite the error in recorded dates, plaintiff was accorded the procedure he was due.  See Toussaint, 801 F.2d at 1100.

Second, plaintiff contends that he should have been issued one or more CDCR 1030 Forms when informed of the evidence underlying his validation, based on Officer Wells' statement to plaintiff in Ad Seg that IGI searched plaintiff's cell based on confidential information obtained from three "kites" prepared by other inmates.  However, as plaintiff was informed in the second level decision on his appeal, because his validation did not rely on any confidential information,[12] there was no requirement to use a CDCR 1030 Form.  See ECF No. 1 at 115-16; see also Cal. Code Regs. tit. 15, § 3378.2(c)(1) ("Confidential information used in the validation package shall be disclosed to the offender via a CDCR Form 1030 [] Confidential Information Disclosure Form").  Plaintiff does not further pursue this matter.

_____

[12]  Although prison officials may have been alerted to plaintiff's gang associations by intercepting these kites, they did not rely on the kites or any information contained therein, or on the confidential reports of any inmates, to reach their decision to validate plaintiff.

Third, plaintiff contends that the failure of OCS defendants Marquez and Harrison to talk with plaintiff about his recommended validation, and merely to "rubber stamp" the recommendation, violated plaintiff's due process right to present his views.  Compl., ECF No. 1 at  20.  However, as both defendants respond, neither was required to meet with plaintiff. Marquez Decl. ¶ 42; Harrison Decl. ¶ 25.  Rather, due process was satisfied when plaintiff was provided his validation packet by defendant Ruggiero and then permitted the opportunity to express his views in writing and in person before Ruggiero.

Fourth, plaintiff contends that, on January 10, 2012, defendant Audette did not interview plaintiff pursuant to the second level review of plaintiff's validation appeal, despite Audette's statement to the contrary.  Compl., ECF No. 1 at 112, 114.  Even if this is true, plaintiff received a comprehensive second level decision authored by HDSP's Chief Deputy Warden, and was subsequently able to exhaust his administrative remedies.  More importantly, because "[t]here is no legitimate claim of entitlement to a grievance procedure," Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988), cert. denied, 488 U.S. 898 (1988), the allegation that a prison official failed to comply with grievance procedures does not state a cognizable claim under Section 1983, see, e.g., Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (failure to process plaintiff's grievances not actionable under Section 1983).  Thus, even if Audette failed to interview plaintiff, this was not a due process violation.

Fifth, and finally, plaintiff challenges his placement in segregated housing on the ground that there was an alleged error in his placement notice.  As initially alleged pursuant to his administrative appeal, plaintiff contends that the disclosure portion of his CDC Form 114-D, Administrative Segregation Unit Placement Notice (ASU Placement Notice), is not dated. However, review of the copy of the form submitted by plaintiff does provide a date of disclosure, June 1, 2011, the date of plaintiff's initial placement in Ad Seg.  See Pl. Ex. B, ECF No. 1 at 32. The court does not discern the error that plaintiff asserts.  The form indicates that plaintiff declined to sign the form on that date.  Id.  The form further indicates that thereafter, on June 7, 2011, plaintiff's placement was reviewed and extended by Officer Chapman, and that plaintiff was present for the review.  Id.  Officer Chapman also wrote:  "Due process violation noted[,]

27

1   review not completed first working day following placement." Id. However, plaintiff's signature

2   on the form signals a waiver of his right to "72 hours preparation time" and a waiver of witnesses.

3   Id.

4        On June 9, 2011, apparently upon plaintiff's release from suicide watch, see Compl., ECF

5   No. 1 at 11, plaintiff appeared before the Institutional Classification Committee (ICC) for his

6   "Initial ASU Review." See Pl. Ex. B (Classification Chrono), ECF No. 1 at 42. Consistent with

7   the notations on plaintiff's ASU Placement Notice, the ICC chrono notes that the initial review of

8   plaintiff's Ad Seg placement "was not completed within the required time frame due to

9   administrative error," but that plaintiff "waived his 72-hour notice." Id. The ICC decided to

10   retain plaintiff in the ASU pending the validation process. Plaintiff was present at the ICC

11   meeting and accorded an opportunity to express his views. A Mental Health representative

12   opined that plaintiff's "mental health was not likely to deteriorate further due to being retained in

13   segregated housing." Id.

14        The information on these forms, including the noted procedural irregularity, which

15   plaintiff apparently waived, demonstrates that prison officials satisfied federal due process

16   requirements in their decision to place plaintiff in segregated housing and retain him there

17   pending the results of the gang validation process. Officials convened a nonadversarial hearing

18   within a reasonable time after plaintiff's initial segregation, where plaintiff was informed of the

19   reasons for his segregated placement, and provided an opportunity to present his views.

20   Toussaint, 801 F.2d at 1100-11. No more is required under federal due process standards. Id.,

21   accord, Bruce, 351 F.3d at 1287.

22               3.    Summary

23        For the foregoing reasons, the court finds no due process error in the procedures

24   associated with plaintiff's placement in segregated housing or the tandem gang validation process

25   against him.[13] Accordingly, defendants' motion for summary judgment on plaintiff's procedural

26   _____

27   [13]  Plaintiff also contends that defendants violated the terms of the settlement agreement in
Castillo v. Terhune, Case No. C 94-2847 MJJ JCS (N.D. Cal. 1994). See, e.g., Compl., ECF No.
1 at 8. Defendants did not address this contention. Nevertheless, this claim fails as a matter of

28   law, for the reasons stated by other judges in this court. As set forth by the magistrate judge in

1    due process claims against defendants Ruggiero, Audette, Marquez and Harris, should be granted.

2    VI.    First Amendment Retaliation Claims

3         Plaintiff contends that defendants Campbell, Ruggiero, and Audette pursued plaintiff's

4    gang validation in retaliation for plaintiff's exercise of his First Amendment rights.

5              1.    Legal Standards for First Amendment Retaliation Claim

6         "Within the prison context, a viable claim of First Amendment retaliation entails five

7    basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

8    because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

9    exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

10   correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (fn. and citations

11   omitted); accord, Watison v. Carter, 668 F.3d 1108, 114-15 (9th Cir. 2012).  "[A] plaintiff who

12   fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as

13   a retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing

14   Rhodes, 408 F.3d at 568, n.11.

15        Filing administrative grievances and pursuing civil rights litigation are protected activities,

16   and it is impermissible for prison officials to retaliate against prisoners for engaging in these

17   activities.  Rhodes, 408 F.3d at 567-68; see also Silva v. Di Vittorio, 658 F.3d 1090, 1104 (9th

18   Cir. 2011) (prisoners retain First Amendment rights not inconsistent with their prisoner status or

19   penological objectives, including the right to file inmate appeals and the right to pursue civil

20   rights litigation).

21        Plaintiff need not prove that the alleged retaliatory action, in itself, violated a

22

---

23   Suarez v. Cate, 2014 WL 996018, at *17, 2014 U.S. Dist. LEXIS 33650, at *48-9 (E.D. Cal. Mar. 13, 2014) (Case No. 2:12-cv-2048 KJM EFB P), report and recommendations adopted , 2014 WL 2745724, 2014 U.S. Dist. LEXIS 82463 (E. D. Cal. June 17, 2014):

24              The violation of consent decrees, settlements, or injunctions in
25   other cases does not provide liability in this action.  See Frost v. Symington, 197 F.3d 348, 353 (9th Cir. 1999); Coleman v. Wilson, 912 F. Supp. 1282, 1294 (E.D. Cal. 1995).  Additionally, the
26   Castillo settlement "provides that alleged noncompliance with the agreement cannot be the basis for granting an individual inmate
27   relief regarding his gang validation." Garcia v. Stewart, No. C 06–6735 MMC (PR), 2009 WL 688887, *7 (N.D. Cal. Mar. 16, 2009)
28   (citing Settlement Agreement § 30c).

constitutional right.  Pratt v. Rowland, 65 F.3d 802, 806 (1995) (to prevail on a retaliation claim,

plaintiff need not "establish an independent constitutional interest" was violated); see also Hines

v. Gomez, 108 F.3d 265, 268 (9th Cir.1997) (upholding jury determination of retaliation based on

filing of a false rules violation report); Rizzo v. Dawson, 778 F.2d 527, 531 (transfer of prisoner

to a different prison constituted adverse action for purposes of retaliation claim).  Rather, the

interest asserted in a retaliation claim is the right to be free of conditions that would not have been

imposed but for the alleged retaliatory motive.

      To sustain a retaliation claim, plaintiff must plead facts that support a reasonable inference

that plaintiff's exercise of his constitutionally protected rights was the "substantial" or

"motivating" factor behind the defendant's challenged conduct.  See Soranno's Gasco, Inc. v.

Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) (citing Mt. Healthy City School Dist. Bd. of Educ.

v. Doyle, 419 U.S. 274, 287 (1977).  Plaintiff must also plead facts which suggest an absence of

legitimate correctional goals for the challenged conduct.  Pratt, 65 F.3d at 806 (citing Rizzo, 778

F.2d at 532).  Mere allegations of  retaliatory motive or conduct will not suffice.  A prisoner must

"allege specific facts showing retaliation because of the exercise of the prisoner's constitutional

rights."  Frazier v. Dubois, 922 F.2d 560, 562 n.1 (10th Cir. 1990).

      If the adverse action occurred "soon after" the protected conduct, such "'timing can

properly be considered as circumstantial evidence of retaliatory intent.'"  Bruce, supra, 351 F.3d

at 1288 (quoting Pratt, 65 F.3d at 805); accord, Soranno's Gasco, 874 F.2d at 1316.  However,

not every allegedly adverse action will support a retaliation claim.  See, e.g., Huskey v. City of

San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on "the logical fallacy

of post hoc, ergo propter hoc, literally, 'after this, therefore because of this'") (citation omitted).

      2.     Analysis

      a.     Defendant Campbell [14]

Plaintiff avers that defendant Campbell searched his cell on April 28, 2011, at the

---

[14]  Defendants contend, alternatively, that plaintiff failed to exhaust his First Amendment
retaliation claim against defendant Campbell because plaintiff did not timely file a grievance
challenging Campbell's April 28, 2011 search of plaintiff's cell and confiscation of property.  See
MSJ, ECF No. 32 at 32.  The court has chosen to address this matter on the merits.

1   direction of defendant Ruggiero, for the purpose of locating items that would support plaintiff's

2   validation as a BGF associate, in retaliation for plaintiff's litigation against Officer Flory.

3   Pursuant to this search, Campbell confiscated the 2008 "Black August" edition of California

4   Prison Focus magazine and a picture of a silverback gorilla.  Both items were later relied on to

5   support plaintiff's validation.  At his deposition, plaintiff testified that he had a conversation with

6   Campbell about his lawsuit against Officer Flory, but was unable to remember when, and stated

7   that "I can't tell you verbatim what I said."  Pl. Depo. 26:19-23; see also 21:4-24:25; 28:10-9.

8         In response, defendant Campbell avers that his search of plaintiff's cell was incidental to a

9   broader search for the phone (contraband) of another inmate whose cell was adjacent to plaintiff's

10   cell.  Defendant Campbell avers that he conducted the search at the direction of his supervisor,

11   not defendant Ruggiero, and that at the time of the search he did not know plaintiff or Officer

12   Flory.

13         It is undisputed that plaintiff was pursuing a civil action against Officer Flory at the time

14   of Campbell's search.  This evidence supports the first and third elements of plaintiff's retaliation

15   claim, specifically, that defendant Campbell took adverse action against plaintiff during the same

16   period of time that plaintiff was exercising his First Amendment rights.  See Rhodes, 408 F.3d at

17   567-68.  This evidence does not, however, support a causal connection between the two.

18         Plaintiff has submitted no evidence to support his allegation that defendant Campbell

19   acted at the direction of defendant Ruggiero, or to rebut defendant Campbell's sworn statement

20   that his search of plaintiff's cell was commenced at the direction of his supervisor, not defendant

21   Ruggiero.  Regardless of who ordered the search and that person's motivations, Campbell could

22   be liable only if he personally was motivated by retaliatory intent.  Plaintiff has identified no

23   evidence to rebut Campbell's sworn statement that, at the time of the search, he knew neither

24   plaintiff nor Officer Flory.  Thus, there is no evidence to support an inference that Campbell

25   undertook the contested search and confiscation of plaintiff's property because plaintiff was

26   exercising his First Amendment rights.  The Ninth Circuit has "repeatedly held that mere

27   speculation that defendants acted out of retaliation is not sufficient."  Wood v. Yordy, 753 F.3d

28   899, 905 (9th Cir. 2014) (citing cases)).  "[A]rgument[s] are not evidence, and they cannot by

1    themselves create a factual dispute sufficient to defeat a summary judgment motion where no

2    dispute otherwise exists."  British Airways Board v. Boeing Co., 585 F.2d 946, 952 (9th Cir.

3    1978) (citation omitted).

4         Accordingly, despite construing the record in the light most favorable to plaintiff, this

5    court concludes that no reasonable juror could find that defendant Campbell's challenged conduct

6    was motivated by retaliation.  Therefore, no material factual dispute requires a trial on this matter,

7    and summary judgment should be granted for defendant Campbell on plaintiff's retaliation claim.

8                          b.      Defendant Ruggiero

9         The verified allegations of plaintiff's complaint assert that defendant Ruggiero expressly

10   told plaintiff that he was recommending plaintiff's validation because of his First Amendment

11   activities, particularly plaintiff's continued pursuit of his civil rights action against Office Flory

12   and others, and generally because plaintiff "file[d] law suits" and "file[d] nothing but paper work

13   on officers."  Compl., ECF No. 1 at 9-12.  Plaintiff also alleges that Ruggiero conceded he

14   "knew" plaintiff was not a BGF member but was "gonna validate [him] anyway," just like he did

15   Chappell.  Id. at 10, 12.  According to the complaint, Ruggiero made these statements on June 1,

16   2011, when he spoke with plaintiff in the program office and disclosed to him the evidence

17   underlying plaintiff's recommended validation.  See Compl., ECF No. 1 at 9 et seq.

18        At his deposition, plaintiff testified that he had this discussion with Ruggiero "during my

19   rebuttal in my validation," Pl. Depo. 30:22-5, which was June 21, 2011, see ECF No. 32-7 at 4;

20   see also Pl. Depo. 31:20-32:4, 33:10, 34:4-5.  Plaintiff alleges that during this meeting, defendant

21   talked "about me knowing [] Chappell.  Saying he's going to validate me, too.  Saying I litigate,

22   for filing paper on an Officer Flory;[15] he's a good man. . .  Told me I'm a non-programmer based

23   on [] Chappell and saying I'm a litigator and asking me why I filed paperwork on Officer Flory,

24   saying I may not remember him, but he used to be at CSP-SAC where I housed at."  Id. at 31:8-

25   19.  Plaintiff testified that defendant "validated [me] because of [] Chappell, as well as me filing

26   paperwork on Officer Flory."  Id. at 34:24-5; see also 35:6-7.

27   ───────────────────

28   [15]  The deposition transcript references Officer "Flores," not "Flory;" the court ignores this
     discrepancy in these findings and recommendations.

1       There is no dispute that plaintiff's civil rights action against Officer Flory and other

2   "paper work on officers" are constitutionally protected activities.  It is also undisputed that gang

3   validation is both an adverse action and a direct harm that satisfies the "chilling" requirement of a

4   retaliation claim.  Rhodes, 408 F.3d at 567-68; Brodheim, 584 F.3d at 1269.  This court's analysis

5   is therefore limited to the remaining two elements of plaintiff's retaliation claim:  (i) whether

6   defendant Ruggiero commenced the validation process against plaintiff because of his protected

7   conduct; and (ii) whether defendant's challenged conduct did not reasonably advance a legitimate

8   correctional goal.  Rhodes, 408 F.3d at 567-68.

9       Ruggiero avers under penalty of perjury that he commenced the validation process against

10   plaintiff because he was presented with evidence supporting plaintiff's BGF associations and, in

11   his position as HDSP Assistant IGI, was required to document the evidence for submission to IGI

12   Audette and the OCS.  See Ruggiero Decl. ¶¶ 1-2, 10-11, 15-6, 19.  Ruggiero avers that he never

13   told plaintiff that he knew plaintiff was not associated with BGF, or threaten to make plaintiff's

14   validation "stick."  Id. ¶¶ 20-1.  Ruggiero also avers that Officer Flory was not a personal friend

15   and that "[a]ny complaints, accusations or litigation that Watts pursued against Officer Flory had

16   no bearing on my actions in investigating and documenting Watts' association with BGF."  Id. ¶

17   22.  Rather, Ruggiero asserts that his "investigation of Watts was triggered by another

18   correctional officer who suggested that Watts may be associated with the [BGF] gang."  Id. ¶ 9.

19       To demonstrate a triable issue as to motive, plaintiff must offer "'either direct evidence of

20   retaliatory motive or at least one of three general types of circumstantial evidence of such

21   motive.'"  McCollum v. CDCR, 647 F.3d 870, 882 (9th Cir. 2011) (quoting Allen v. Iranon, 283

22   F.3d 1070, 1077 (9th Cir. 2002)).  These three types of circumstantial evidence are:  (1) proximity

23   in time between the protected conduct and the alleged retaliation; (2) defendant's expressed

24   opposition to the protected conduct; and (3) any other evidence demonstrating that defendant's

25   asserted reasons for his adverse action were false or pretextual.  McCollum, 647 F.3d at 882

26   (citing Allen, 283 F.3d at 1077).

27       Here, plaintiff's testimony provides direct evidence of defendant Ruggiero's allegedly

28   express opposition to plaintiff's protected conduct and resulting retaliatory animus in pursuing

1   plaintiff's validation.  Plaintiff's verified statements and sworn deposition testimony must be

2   accepted as true for purposes of summary judgment.  Thus, viewing the evidence in the light most

3   favorable to plaintiff, the court finds that there exists a material factual dispute concerning the

4   second, causal element for sustaining a retaliation claim, that is, whether defendant Ruggiero's

5   adverse action was "because of" plaintiff's protected conduct.  Rhodes, 408 F.3d at 567-68;

6   Brodheim, 584 F.3d at 1269.

7          The last element of a retaliation claim requires that plaintiff introduce evidence

8   demonstrating that the adverse action taken by defendant Ruggiero "did not reasonably advance a

9   legitimate correctional goal," Rhodes, 408 F.3d at 567-68, and that plaintiff's protected activity

10   was "the 'substantial' or 'motivating' factor behind the defendant's conduct," Soranno's Gasco,

11   874 F.2d at 1314.  Plaintiff bears the burden of proving the absence of legitimate correctional

12   goals for defendant's challenged conduct.  See Pratt, 65 F.3d at 806 (citing Rizzo, 778 F.2d at

13   532).

14          "[I]f, in fact, the defendants abused the gang validation procedure as a cover or a ruse to

15   silence and punish [an inmate] because he filed grievances [and/or pursued litigation], they

16   cannot assert that [the inmate's] validation served a valid penological purpose, even though he

17   may have arguably ended up where he belonged."  Bruce, 351 F.3d at 1289 (citations omitted).

18   Thus, the court cannot rely on "some evidence" supporting plaintiff's gang validation to find that

19   Ruggiero's conduct was not retaliatory.  Id. (citation omitted) ("The 'some evidence' standard

20   applies only to due process claims attacking the result of a disciplinary board's proceeding, not

21   the correctional officer's retaliatory accusation.").  Nor may defendant "defeat a retaliation claim

22   on summary judgment simply by articulating a general justification for a neutral process[.]"  Id.

23   Nevertheless, this court is required to "'afford appropriate deference and flexibility' to prison

24   officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be

25   retaliatory."  Pratt, 65 F.3d at 807 (citing Sandin, 515 U.S. at 481).

26          Defendant Ruggiero avers, with supporting affidavits by the other defendants, that the

27   evidence of plaintiff's suspected gang involvement required plaintiff's validation, thus serving the

28   "legitimate penological interest in stopping prison gang activity."  Bruce, 351 F.3d at 1289.

34

1   Ruggiero argues that this general justification was particularized for him as HDSP's Assistant IGI

2   – presented with such evidence, Ruggiero was required to document it.

3          Nevertheless, plaintiff rebuts this "general justification for a neutral process," id., with his

4   verified allegations and deposition testimony that defendant Ruggiero expressly informed

5   plaintiff that he was being validated because of his constitutionally protected activities.  As

6   succinctly framed by plaintiff, defendant Ruggiero "can't abuse authority to personally screw

7   people."[16]  Oppo., ECF No. 38 at 20.  Although there is evidence that may reasonably be

8   construed to cast doubt the credibility of plaintiff's testimony,[17] credibility may not be

9   determined by the court on summary judgment.  It is a quintessential jury issue.  Viewing the

10  evidence in the light most favorable to plaintiff, the court finds that there exists a material factual

11  dispute whether defendant Ruggiero's validation of plaintiff advanced a legitimate correctional

12  goal.  See Rhodes, 408 F.3d at 567-68.  "[P]rison officials may not defeat a retaliation claim on

13  summary judgment simply by articulating a general  justification for a neutral process, when there

14  is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise

15  of a constitutional right[.]"  Bruce, 351 F.3d at 1289; accord, Brodheim, 584 F.3d at 1273

16  (defendant's express intent to retaliate against prisoner for exercise of his First Amendment rights

17  "cannot escape constitutional scrutiny by citing a legitimate penological interest").

18         For these reasons, defendants' motion for summary judgment on plaintiff's retaliation

19  claim against defendant Ruggiero should be denied.

20  ////

21

22  [16]  Plaintiff made this statement in response to defendants' reliance on decisions of the Supreme
    Court in the Title VII context which apply a "but-for" causation analysis to sustain a retaliation
23  claim, requiring evidence that the challenged adverse action would not have occurred "but for"
    the defendant's retaliatory motive.  See, e.g., Hartman v. Moore, 547 U.S. 250, 260 (2006)
24  ("action colored by some degree of bad motive does not amount to a constitutional tort if that
    action would have been taken anyway") (citing Crawford-El v. Britton, 523 U.S. 574, 593 (1998),
25  and Mt. Healthy, supra, 419 U.S. at 285-864.  Plaintiff responded that "but-for don't even matter
    (whatever but-for is).  [Defendant Ruggiero's] actions is (sic) probably covered by this but-for as
26  well.  He can't abuse authority to personally screw people."  Oppo., ECF No. 38 at 19-20.
    [17]  For example, plaintiff's June 17, 2011 written rebuttal to his proposed validation is silent as to
27  Ruggiero's alleged retaliatory statements made June 1, 2011.  Similarly, plaintiff's October 2011
    administrative appeal is silent as to Ruggiero's alleged retaliatory statements made June 1, 2011
28  and/or at plaintiff's June 21, 2011 interview.

1

c.      Defendant Audette

2          Plaintiff claims that defendant Audette attempted to bribe him in January 2012 by offering

3     to "back off" plaintiff's gang validation if plaintiff dropped his suit against Officer Flory, and by

4     offering plaintiff drugs confiscated from other inmates if plaintiff would act as an informant.

5          Defendant Audette has filed an affidavit in which he avers that he never made the

6     statements alleged by plaintiff.  Audette also states that he had no authority to impact the

7     validation decision after forwarding plaintiff's packet to OCS in June 2011, and that, in any case,

8     the final decision validating plaintiff was reached in September 2011, four months before his

9     alleged interactions with plaintiff.

10          Plaintiff's evidence fails to support the essential elements of a retaliation claim against

11    defendant Audette, for several reasons.  First, there is no evidence that Audette personally took

12    adverse action against plaintiff.  Audette was not involved in the decisions to search plaintiff's

13    cell, or in the determination that a validation packet was warranted.  He did not make the

14    validation determination.  Audette merely received the validation packet from Ruggiero,

15    determined that it complied with CDCR regulations, and forwarded it to OCS.  Second, there is

16    no evidence that Audette knew about the Flory matter prior to processing the validation packet.

17    Audette avers that he never knew about plaintiff's litigation, and plaintiff's only proffered

18    evidence on the matter involves statements allegedly made four months after validation.  This

19    evidentiary record does not support an inference of retaliatory intent related to Audette's

20    forwarding of the packet.  Third, while the offering of a bribe would certainly constitute grave

21    misconduct, plaintiff's verified allegations in this regard do not raise a triable issue as to

22    retaliation.  Even if an unsuccessful bribe attempt could constitute adverse action for purposes of

23    a First Amendment retaliation claim,[18] the bribe here was allegedly offered *after* the disputed

24    validation.  Accordingly, it cannot support a finding that the validation was retaliatory.

25

26    [18]  Cf., Brodheim, 584 F.3d at 1265-66, 1270-71 (material factual dispute whether handwritten
      note prepared by appeals coordinator, warning plaintiff "to be careful what you write" on inmate
27    request for interview form, was an "adverse action" supporting a retaliation claim).  Because
      plaintiff's claim against Audette fails on other grounds, there is no need to decide whether bribes
28    as well as threats may constitute adverse actions.

36

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).  Accordingly, this court recommends that summary judgment be granted for defendant Audette on plaintiff's retaliation claim.

VII.    Eighth Amendment Claim

Defendants contend that plaintiff failed to exhaust his Eighth Amendment deliberate indifference claim against defendant Ruggiero for confiscating plaintiff's orthopedic boots pursuant to his search of plaintiff's cell on May 9, 2011, and for then failing to return them. Plaintiff responds that administrative remedies were unavailable to him on this claim because defendant Ruggiero intercepted and destroyed each of plaintiff's attempted appeals.

A.    Additional Facts

It is undisputed that defendant Ruggiero confiscated plaintiff's orthopedic boots on May 9, 2011, assertedly because he did not know that the boots were medically required and believed them to be contraband.  See Ruggiero Decl. ¶ 12, and Dfs. Ex. 4-D.  Plaintiff testified that he was thereafter relegated to using "little shoes" without insoles and with "little bitty holes in the bottom," that were very uncomfortable and failed to provide adequate stability.  Pl. Depo. 71:15-72; 72:16-73:17.

Plaintiff has submitted substantial evidence supporting his allegations that he has serious medical problems with his knees, including physical and mobility impairments despite several knee surgeries, and chronic pain for which he is prescribed pain medication.  See Compl., ECF No. 1 at 57-71 (Pl. Ex. F).  Plaintiff has also submitted a copy of an accommodation chrono issued on his behalf in 2006 that includes authorization to possess "Stacy Adams" orthopedic shoes.  See id. at 72-73 (Pl. Ex. F-1).  Although this accommodation is designated both "permanent" and for a "12 month" duration, id., plaintiff testified at his deposition that the "permanent" designation prevailed, Pl. Depo. 69:13-24.  Plaintiff also testified that, when Ruggiero confiscated his boots, plaintiff had two recent, active chronos authorizing his possession of the boots.  Pl. Depo. 68:21-3.  Although copies of these chronos have not been submitted to the court, plaintiff testified that they were dated March 25, 2011 and April 4, 2011, and that both

1    chronos authorized plaintiff's possession of "hinged knee braces and orthopedic boots."  Id. at

2    69:25-70:12.

3             Plaintiff testified that he was transferred to HDSP with his orthopedic boots on November

4    2, 2010.  Id. at 70:13-24.  At the time of his deposition on October 24, 2014, plaintiff was wearing

5    orthopedic shoes and two hinged knee braces that he had purchased himself.  Pl. Depo.  68:17-20.

6    He testified that they had been issued in November 2013 during his incarceration at California

7    State Prison-Corcoran.  Id. at 72:7-12.

8             Plaintiff contends that defendant Ruggiero threw away every appeal he submitted

9    challenging Ruggiero's confiscation of plaintiff's boots and other items, and therefore that

10   administrative remedies were unavailable to him.  Plaintiff alleges in pertinent part, ECF No. 38

11   at 9, 24 (with minor edits):

> Plaintiff exhausted all available administrative remedies.  (Those
> that were not exhausted is because defendants did not return the
> appeal.)  ¶  And in accordance with [the PLRA], I have to exhaust
> those remedies that are available, excessible [sic] to me.    If
> defendant Ruggiero don't return plaintiff's CDC-602/grievance,
> then plaintiff's available remedies [sic, incomplete sentence].    It
> was common practice at [HDSP] to throw away, or stagnate and
> stifle CDC-602/appeals and each time plaintiff did submit one on
> the matter of his phone book and orthopedic boots, defendant
> Ruggiero would come and tell plaintiff that he has that appeal, so
> the plaintiff could not exhaust any appeals.  Defendant Ruggiero
> told plaintiff that ISU takes the mail bags every day to their quarters
> and read the outgoing mail, and when plaintiff's 602's come
> through, he gets them.  In other words, there was no available
> remedies.
>
> . . . When defendants intentionally stagnate and stifle that process,
> then there is no available remedy, and for purpose of civil action
> plaintiff has exhausted those remedies available.  Ruggiero told
> plaintiff he took his appeal and that they get mail bags every
> morning and will get all appeals filed by plaintiff. . . . Plaintiff has  .
> . . exhausted those remedies available to him.

24            HDSP Appeals Coordinator L. Lopez has filed a declaration addressing these matters.  See

25   Lopez Decl., Dfs. Ex. 12.  Lopez avers that on May 19, 2011, ten days after the confiscation of

26   plaintiff's boots by Ruggiero, plaintiff submitted a grievance seeking the return of his boots and

27   other confiscated items.  The grievance was screened out the next day because plaintiff had used

28   ////

1  dividers in violation of CDCR regulations.  Lopez Decl. ¶ 11; <u>see also</u> Cal. Code Regs. tit. 15, §

2  3084.6(b)(12) (2011).

3      Six days later, on May 26, 2011, plaintiff resubmitted the grievance without dividers.

4  However, this was screened out on the same date because, upon examination, it was clear that

5  plaintiff had not first sought informal resolution of his grievance utilizing the proper form.  <u>See</u>

6  Cal. Code Regs. tit. 15, § 3084.6(b)(14), (15) (2011).  Plaintiff was instructed to submit a CDCR

7  22 Form[19] to Campbell or Ruggiero, requesting the return of his confiscated items.  Watts had 30

8  calendar days to correct this deficiency.  Lopez Decl. ¶ 11. However, plaintiff waited more than

9  30 days to resubmit his grievance, and attempted to submit it on July 12, 2011, November 23,

10  2011, and December 2, 2011.  Each resubmission was screened out and rejected as untimely.

11  Plaintiff did challenge the rejection decision.  Lopez Decl. ¶ 11.

12      Thereafter, following plaintiff's transfer from HDSP, he submitted four medical appeals

13  addressing his need for orthopedic shoes.  Two appeals were submitted during plaintiff's

14  incarceration at California Correctional Institution (CCI ), and two were submitted during his

15  incarceration at California State Prison-Corcoran (CSP-COR).  However, none of these appeals

16  identified HDSP or defendant Ruggiero.[20]

---

17  [19]  Lopez explains that new CDCR regulations were implemented January 28, 2011, requiring that
      inmates initially seek informal resolution of grievances that are not staff complaints, using the
18    new CDCR 22 Form.  Lopez explains, Lopez Decl., ¶ 4:

19                One use of the CDCR 22 Form was for inmates to address appeal
              issues that were not classified as staff complaints, and receive a
20            written response from a particular staff member.  The staff member
              was expected to respond to the CDCR 22 Form within three
21            working days, unless unusual or exigent circumstances exist.  Upon
              submission of a CDCR 22 Form, the inmate receives a receipt.
22            When an inmate receives a dissatisfactory response to a CDCR 22
              Form, or no response at all, he can present either the CDCR 22
23            response or receipt to the staff member's supervisor for a response.
              If dissatisfied with the supervisor's response, the inmate can, within
24            30 calendar days of receipt, file an administrative grievance,
              attaching the CDCR 22 Forms or receipt as supporting
25            documentation.
      [20]  These grievances were designated Appeal Log No. CCI-HC-12033691(submitted in April
26    2012); Appeal Log No. CCI-HC-12033754 (submitted in May 2012); Appeal Log No. COR-HC-
      12050979 (submitted in July 2012); and Appeal Log No. COR-HC-13054247 (submitted in
27    September 2013).  <u>See</u> Defendants' Separate Statement of Undisputed Material Facts, ECF No.
      32-1 at 1-16, ¶¶ 71-84, relying on the declarations of R. Briggs, CDCR Acting Chief of the
28    CDCR Office of Appeals (Dfs. Ex. 10); R. Robinson, Chief of the Inmate Correspondence and
      Appeals Branch of California Correctional Health Care Services (Dfs. Ex. 11); L. Lopez, HDSP

1              B.      Legal Standards for Exhausting Administrative Remedies

2          The Prison Litigation Reform Act (PLRA) requires that prisoners exhaust "such

3    administrative remedies as are available" before commencing a suit challenging prison

4    conditions.  42 U.S.C. § 1997e(a).  Regardless of the relief sought, a prisoner must pursue an

5    appeal through all levels of a prison's grievance process as long as some remedy remains

6    available.  "The obligation to exhaust 'available' remedies persists as long as *some* remedy

7    remains 'available.'  Once that is no longer the case, then there are no 'remedies . . . available,'

8    and the prisoner need not further pursue the grievance."  Brown v. Valoff, 422 F.3d 926, 935 (9th

9    Cir. 2005) (original emphasis) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).  Hence, "[a]n

10   inmate has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in

11   order to exhaust his administrative remedies."  Harvey v. Jordan, 605 F.3d 681, 685 (9th Cir.

12   2010).

13         The PLRA also requires that prisoners, when grieving their appeal, adhere to CDCR's

14   "critical procedural rules."  Woodford v. Ngo, 548 U.S. 81, 91 (2006).  "The level of detail

15   necessary in a grievance to comply with the grievance procedures will vary from system to

16   system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

17   boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007).

18         In 2011, as now, an appeal may be "rejected" for several reasons, including the failure to

19   submit the appeal "on the departmentally approved appeal forms," or "at an inappropriate level

20   bypassing required lower level(s) of review," and, inter alia, the use of "dividers or tabs."  See

21   Cal. Code Regs. tit. 15, § 3084.6(14), (15) and (12) (2011), respectively.  In 2011, when an

22   appeal is "rejected," the appeals coordinator was required to "provide clear and sufficient

23   instructions regarding further actions the inmate . . . must take to qualify the appeal for

24   processing," and provide 30 calendar days within which to do so.  Id., § 3084.6(a)(1), (2).

25         Although "the PLRA's exhaustion requirement applies to all inmate suits about prison

26   life," Porter v. Nussle, 534 U.S. 516, 532 (2002), the requirement for exhaustion under the PLRA

27   _____

28   Appeals Coordinator (Dfs. Ex. 12) ; A. Pacillas, Corcoran State Prison Appeals Coordinator (Dfs.
     Ex. 13); and J. Wood, California Correctional Institution Appeals Coordinator (Dfs. Ex. 14).

1   is not absolute.  As explicitly stated in the statute, "[t]he PLRA requires that an inmate exhaust

2   only those administrative remedies 'as are available.'"  Sapp v. Kimbrell, 623 F.3d 813, 822 (9th

3   Cir. 2010) (quoting 42 U.S.C. § 1997e(a)) (administrative remedies plainly unavailable if

4   grievance was screened out for improper reasons); see also Nunez v. Duncan, 591 F.3d 1217,

5   1224 (9th Cir. 2010) ("Remedies that rational inmates cannot be expected to use are not capable

6   of accomplishing their purposes and so are not available.").  "We have recognized that the PLRA

7   therefore does not require exhaustion when circumstances render administrative remedies

8   'effectively unavailable.'"  Sapp, 623 F.3d at 822 (citing Nunez, 591 F.3d at 1226); accord

9   Brown, 422 F.3d at 935.

10          The Ninth Circuit has laid out the analytical approach to be taken by district courts in

11   assessing the merits of a motion for summary judgment based on the alleged failure of a prisoner

12   to exhaust his administrative remedies.  As set forth in Albino v. Baca, 747 F.3d 1162, 1172 (9th

13   Cir. 2014), cert. denied sub nom. Scott v. Albino, 135 S. Ct. 403 (2014) (citation and internal

14   quotations omitted):

15              [T]he defendant's burden is to prove that there was an available
                administrative remedy, and that the prisoner did not exhaust that
16              available remedy. . . .  Once the defendant has carried that burden,
                the prisoner has the burden of production.  That is, the burden shifts
17              to the prisoner to come forward with evidence showing that there is
                something in his particular case that made the existing and
18              generally available administrative remedies effectively unavailable
                to him.  However, . . . the ultimate burden of proof remains with the
19              defendant.

20          If a court concludes that a prisoner failed to exhaust his available administrative remedies,

21   the proper remedy is dismissal without prejudice.  See Jones v. Bock, 549 U.S. 199, 223-24

22   (2010); Lira v. Herrera, 427 F.3d 1164, 1175-76 (9th Cir. 2005).

23          C.          Analysis:  Plaintiff Failed to Exhaust his Administrative Remedies

24          Applying the analytical framework set forth in Albino, defendants bear the initial burden

25   of demonstrating that plaintiff had an available administrative remedy to grieve his deliberate

26   indifference claim against defendant Ruggiero, but did not exhaust that remedy.  See Albino, 747

27   F.3d at 1172.

28          Defendants rely generally on the sworn statements of prison officials that CDCR's

41

1   comprehensive administrative appeals process was available to all inmates, including those at

2   HDSP, during the relevant period.  See Declarations of R. Briggs, CDCR Acting Chief of the

3   CDCR Office of Appeals, Dfs. Ex. 10; R. Robinson, Chief of the Inmate Correspondence and

4   Appeals Branch of California Correctional Health Care Services, Dfs. Ex. 11; and L. Lopez,

5   HDSP Appeals Coordinator, Dfs. Ex. 12.  These statements are consistent with plaintiff's verified

6   acknowledgement on the face of his complaint that HDSP offered an administrative process that

7   he effectively utilized to exhaust the appeal challenging his validation (Appeal Log No. HDSP-

8   11-01661).  See Compl., ECF No. 1 at 3.  Together these statements support a finding that

9   HDSP's administrative appeals process was generally available to plaintiff to challenge

10  Ruggiero's confiscation of his boots as a deliberate indifference claim.

11          However, as conceded by plaintiff, he did not exhaust his administrative remedies in

12  pursuing this claim.[21]

13          The burden now shifts to plaintiff "to come forward with evidence showing that there is

14  something in his particular case that made the existing and generally available administrative

15  remedies effectively unavailable to him."  Albino, 747 F.3d at 1166.

16          Plaintiff contends that HDSP's grievance process was effectively unavailable to him

17  because defendant Ruggiero intercepted his appeals and, consistent with "common practice" at

18  HDSP, threw them away or otherwise prevented their processing.  See Oppo., ECF No. 38 at 9,

19  24.  Moreover, plaintiff contends that defendant Ruggiero so informed plaintiff.  Id.

20          However, plaintiff has submitted no evidence in support of his allegations, which lack

21  sufficient specificity to create a material factual dispute.  Plaintiff does not describe, or attempt to

22  describe, the dates or content of his allegedly relevant appeals, and does not identify the dates or

23  circumstances of defendant Ruggiero's alleged interceptions of plaintiff's appeals, or defendant's

24  alleged statements to plaintiff conceding that he did so.  "Plaintiff has failed to provide specific

---

25

26  [21]  See also Defendants' Separate Statement of Undisputed Material Facts, ECF No. 32-1 at 1-16,
    ¶¶ 71-84, which relies on the declarations of R. Briggs, CDCR Acting Chief of the CDCR Office
27  of Appeals (Dfs. Ex. 10); R. Robinson, Chief of the Inmate Correspondence and Appeals Branch
    of California Correctional Health Care Services (Dfs. Ex. 11); L. Lopez, HDSP Appeals
28  Coordinator (Dfs. Ex. 12) ; A. Pacillas, Corcoran State Prison Appeals Coordinator (Dfs. Ex. 13);
    and J. Wood, California Correctional Institution Appeals Coordinator (Dfs. Ex. 14).

1   factual information concerning to whom he gave the appeals, whether he submitted follow-up

2   inquiries regarding these appeals, or whether he attempted to resubmit the appeal once he

3   allegedly received no response." Bassett v. Callison, 2010 WL 5393985, at *7, 2010 U.S. Dist.

4   LEXIS 137987, at *18 (E.D. Cal. Dec. 22, 2010) (Case No. 2:10-cv-0539 KJN P) ("Plaintiff

5   stated, in conclusory fashion, that officials destroyed or lost these appeals . . . . [but] he provided

6   no facts or evidence to support this conclusion"). [22]

7         For these reasons, the court finds that plaintiff has submitted no evidence creating a

8   material factual dispute on the question whether his administrative remedies were effectively

9   unavailable for the purpose of exhausting his deliberate indifference claim against defendant

10   Ruggiero. Despite receiving timely and adequate notice of the necessity to submit evidence in

11   support of his allegations in opposition to defendants' motion for summary judgment premised on

12   administrative exhaustion, see ECF No. 16 at 6; ECF No. 32 at 2-3, plaintiff failed to do so.

13         Accordingly, the court finds that plaintiff has not met his burden of producing evidence

14   that HDSP's generally available administrative remedies were effectively unavailable to plaintiff

15   in exhausting his deliberate indifference claim against defendant Ruggiero. See Albino, 747 F.3d

16   at 1172. As a result, defendants' motion for summary judgment on this matter should be granted

17   ////

18

19   [22] Accord Gaines v. C/O Bennett, 2016 WL 426609, at *8, 2016 U.S. Dist. LEXIS 13736, at *22-
      3 (E.D. Cal. Feb. 4, 2016) (Case No. 2:13-CV-2070 KJM AC P) (report and recommendations)

20   (collecting cases, as follows):
            . . . Jones v. Bishop, 2010 WL 4628067, at *6, 2010 U.S. Dist.

21             LEXIS 117837, at *16 (E.D. Cal. Nov. 5, 2010) (Case No. 2:09-cv-
            0150 JLQ EFB P) ("There is no evidence in the record to support

22             Plaintiff's bald assertion that he ever timely filed or attempted to
            timely file a grievance/appeal . . . . Although the court must

23             construe the Plaintiff's materials liberally, it is not permissible for
            the court to sustain a general allegation . . . without any measure of

24             evidentiary support in the record."); . . . Bull v. Scribner, 2012 WL
            5878195, at *5, 2012 U.S. Dist. LEXIS 165840, at *17 (E.D. Cal.

25             Nov. 20, 2012) (Case No. 1:05-cv-01255 LJO GSA P) ("Plaintiff
            fails to demonstrate that he properly utilized the process available

26             to him."), aff'd sub nom. Bull v. Brown, 616 F. Appx. 289 (9th Cir.
            2015); Webb v. Cahlander, 2015 WL 6531642, at *4, 2015 U.S.

27             Dist. LEXIS 146352, at *9 (E.D. Cal. Oct. 28, 2015) (Case No.
            1:13-cv-01154 DLB P) ("Plaintiff fails to substantiate his claim

28             with evidence in any manner.").

1    and plaintiff's deliberate indifference claim against defendant Ruggiero should be dismissed

2    without prejudice.  See Jones, 549 U.S. at 223-24.

3            VIII.    Summary of Findings and Recommendations

4            Defendants' motion for summary judgment on plaintiff's Fourteenth Amendment due

5    process claims should be granted because the evidence relied on by prison officials constitutes

6    "some evidence" supporting plaintiff's gang validation, and the procedures associated with

7    plaintiff's related placement in segregated housing complied with federal due process standards.

8            Defendants' motion for summary judgment on plaintiff's First Amendment retaliation

9    claims should be granted in part and denied in part for the following reasons:  (1) defendants'

10   motion should be granted on plaintiff's retaliation claim against defendant Campbell because

11   plaintiff submitted no evidence to support his allegation that Campbell confiscated items from

12   plaintiff's cell in response to plaintiff's constitutionally protected activities; (2) defendants'

13   motion should be denied on plaintiff's retaliation claim against defendant Ruggiero because

14   plaintiff submitted evidence demonstrating a genuine issue of material fact whether Ruggiero

15   recommended plaintiff's validation in retaliation for plaintiff's exercise of his constitutionally

16   protected rights right; and (3) defendants' motion should be granted on plaintiff's retaliation

17   claim against defendant Audette because plaintiff failed to state a cognizable claim.

18           Defendants' motion for summary judgment on plaintiff's Eighth Amendment deliberate

19   indifference claim should be granted because plaintiff submitted no evidence on which a

20   reasonable juror could conclude that HDSP's administrative remedies were effectively

21   unavailable to plaintiff to exhaust this claim.

22           IX.    Conclusion

23           For the foregoing reasons, this court recommends that defendants' motion for summary

24   judgment, ECF No. 32, be granted in part and denied in part, as follows:

25           1.  Defendants' motion for summary judgment should be granted on plaintiff's Eighth and

26   Fourteenth Amendment claims, and on plaintiff's First Amendment claims against defendants

27   Campbell and Audette.

28           2.  Defendants' motion for summary judgment should be denied on plaintiff's First

1    Amendment claim against defendant Ruggiero.

2       These findings and recommendations are submitted to the United States District Judge

3    assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

4    after being served with these findings and recommendations, any party may file written

5    objections with the court and serve a copy on all parties.  Such a document should be captioned

6    "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

7    failure to file objections within the specified time may waive the right to appeal the District

8    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED: March 9, 2016

10

11                  ALLISON CLAIRE
                  UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28